K7FKCHEC

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                          19 CR 833 (SHS)

 5   ANTHONY CHEEDIE,

 6                  Defendant.

 7   ------------------------------x

 8                                          New York, N.Y.
                                            July 15, 2020
 9                                          3:40 p.m.

10   Before:

11                    HON. SIDNEY H. STEIN,

12                                          District Judge

13
                           APPEARANCES
14
     AUDREY STRAUSS
15        Acting United States Attorney for the
          Southern District of New York
16   BENET KEARNEY
          Assistant United States Attorney
17
     FREDERICK LAWRENCE SOSINSKY
18   ANASTASIOS SARIKAS
          Attorneys for Defendant
19

20   ALSO PRESENT:

21   MOHAMMED AHMED, Pretrial Services (By Speakerphone)

22

23

24

25
```

K7FKCHEC

1          (Case called)

2          MS. KEARNEY:  Good afternoon, your Honor.  Benet

3     Kearney, for the United States.

4          MR. SOSINSKY:  For Mr. Cheedie, Fred Sosinksy, and I

5     am joined by my colleague, Anastasios Sarikas, as well.

6          MR. SARIKAS:  Good afternoon.

7          THE COURT:  Good afternoon.

8          Mr. Cheedie is present; is that correct?

9          MR. SOSINSKY:  Yes, Judge, standing between us.

10          THE DEPUTY CLERK:  And Mr. Ahmed?

11          MR. AHMED:  Yes.

12          THE COURT:  Make your appearance, sir.  You're

13     Mr. Ahmed from pretrial services, correct?

14          MR. AHMED:  Good afternoon, Judge.  Mohammed Ahmed, on

15     behalf of pretrial services.

16          THE COURT:  Good afternoon.

17          Good afternoon, everyone.  These are strange days.

18     Everybody in the courtroom is masked.  I just took my mask off,

19     there's nobody near me, and it's easier to speak, but I

20     appreciate everyone being here.

21          There are two purposes for our conference today.  One

22     is to act on the request for a bail review by pretrial

23     services, and Mr. Ahmed could not make it in, and I appreciate

24     his being on the phone.  And I take this as a very serious

25     issue.  There are a number of people in the courtroom who I

K7FKCHEC

1    take it are here in support of Mr. Cheedie, in addition to the

2    lawyers, and the court reporter, and my clerks, and my deputy.

3          The second is to have a Curcio hearing to see if

4    Mr. Cheedie understands the potential conflict or not, and I

5    will explain that.

6          But I'm going to start with the request for a bail

7    review.

8          Now, Mr. Cheedie -- and I will hear from either of the

9    lawyers or both of the lawyers.

10          Mr. Cheedie, perhaps you were misled by the fact that

11    I believe all of the defendants in this case are not

12    incarcerated; in other words, no one has been incarcerated.

13          Is that right, Ms. Kearney?

14          MS. KEARNEY:  That's correct.  No one is incarcerated,

15    that's correct.

16          THE COURT:  So maybe you thought in these cases,

17    people just aren't incarcerated.  You're wrong.  That's point

18    one.

19          Point two is, things like this, normally I give people

20    one strike, I think that that's appropriate, and now you have

21    two strikes.  And at the end of my presentation, I'm going to

22    ask you -- first your lawyer, if he wants to speak -- if you

23    can give me a single reason why you shouldn't be incarcerated.

24    I'm sure your lawyer will come up with a number.

25          You seem to have a problem -- and, again, I'll let you

K7FKCHEC

1    speak.  I'm just giving you my view after having read these

2    papers.  The problem with the problem -- that is, your problem

3    is with alcohol.  The problem with the problem is that you're

4    putting other people at risk.  I certainly would have no

5    interest in you hurting yourself while driving drunk or under

6    the influence of alcohol -- I certainly don't want that to

7    happen -- but I have a responsibility to make sure it doesn't

8    happen to other people, and you're putting them at risk, and

9    have twice or have at least twice.  I don't want to incarcerate

10    you, especially in this time of COVID.  I've been dealing each

11    day with a number of requests for compassionate release.  This

12    is my first day in the courthouse in quite a while.  I do it

13    while working remotely, because, not surprisingly, those who

14    are incarcerated would rather be anywhere else than

15    incarcerated.  That makes sense, people are rational, but

16    especially at this time, where if you get COVID in a jail,

17    under pretrial detention, it makes it even worse.

18           So, here, I have a strong incentive not to incarcerate

19    you.  And you have no history of violence or anything like

20    that -- you're not going to flee, that's not an issue -- but

21    what is at issue is the possibility, or likelihood, or

22    potential for you to kill somebody in a car who's not yourself.

23    It happens all the time.  And you were given one strike.

24           Here's the information I think I know:

25           Back in November of last year, you were arrested on

K7FKCHEC

1    these charges, conspiracy to commit wire fraud, and, as I think

2    you know, I told you I'm quite familiar with the general

3    complex of fraudsters here because I have presided over a trial

4    in a related matter that's now over.  You weren't incarcerated,

5    you were let out on bail, and still are.  And shortly

6    thereafter, in February of this year, you were arrested in

7    Little Falls for driving while intoxicated, refusing to

8    cooperate, reckless driving, leaving the scene, no insurance,

9    no seatbelt.  It doesn't make any sense at all, I mean, for

10   somebody to do that.  It doesn't make any sense for somebody to

11   drive while intoxicated.  It doesn't make any sense for

12   somebody to refuse the assistance of law enforcement.  It

13   doesn't make any sense, unless you're under the influence of

14   alcohol, to leave the scene.  It certainly doesn't make any

15   sense, whether you have been drinking or not, to have no

16   insurance while driving and not to be using a seatbelt.  Those

17   are the accusations, as I remember.

18          Pretrial let me know about that.  They also said they

19   didn't think any action was needed by me, except that you were

20   going to go to outpatient alcohol treatment.  That made sense.

21   You know, we don't come down hard on somebody when they've,

22   quote, made a mistake, end quote, although I could have

23   incarcerated you at that time.  You then asked, as it were, a

24   favor or special attention, a special action by the Court,

25   which, again, I was pleased, happy, to give you; you were going

K7FKCHEC

1    to go to Sharon, Connecticut, I think, to be with your inlaws,

2    and then I extended, so you were there for one month.  Again,

3    happy to do it, it made sense.

4           While there, you were arrested by the Sharon police.

5    Your car had been damaged.  You were under the influence to

6    some extent with alcohol, presumably.  You had been in the

7    hit-and-run accident; they found that out pretty quickly.  It

8    didn't take a genius to know that the car was damaged, and the

9    hit-and-run had been called in, or was about to be called in.

10   According to the police report, you were slow in your speech,

11   you were confused, you gave conflicting answers as to what you

12   were doing.  Apparently, you said you were getting parts for

13   your pool, you were getting dinner for your wife.  You were

14   charged with operating under the influence, you refused to

15   leave the car, you seemed to give the police a hard time.

16          I need to protect the public.  I'll ask you a

17   rhetorical question, because you should talk to your lawyer

18   before saying anything -- anything you say can be used against

19   you -- but the rhetorical question is, why shouldn't I revoke

20   your bail?

21          Mr. Sosinksy, what would you like to say?

22          MR. SOSINSKY:  Thank you, your Honor.

23          Would you like me to wear the mask, or may I --

24          THE COURT:  I guess that's up to Ms. Kearney, who's

25   sitting in front of you.

K7FKCHEC

1          MR. SOSINSKY:  I'm happy to move back and keep my

2     voice up, if I could.

3          MS. KEARNEY:  I have the antibodies.

4          MR. SOSINSKY:  She has the antibodies.

5          THE COURT:  We don't know what that means, sir.  We

6     don't know what that means.  And I just read an article that

7     they have found that these antibodies of COVID have a

8     surprisingly short half-life.  Since I don't know what that

9     means either, I'm okay.  Why don't you go over there.

10          MR. SOSINSKY:  Judge, what you may not know -- I

11     suppose you wouldn't know -- is that following the first of the

12     two incidents that your Honor made mention of, Mr. Cheedie, not

13     at my urging, really, but at his own, looked into and had made

14     arrangements to enter into an extended drug and alcohol

15     rehabilitation in-person program in Pennsylvania, and we were

16     preparing to ask the Court about it literally as the COVID

17     shutdown began.

18          I mention that -- you have the name, in fact.

19     Mohammed, of pretrial services, and I both spoke, and I emailed

20     him information.  And I think everyone was in agreement at that

21     time that he very much needed inpatient alcohol treatment, if

22     ever he was to be able to understand the underpinnings of what

23     drives him to drinking, which, as the Court, I think,

24     suggested, was really not the issue -- it's certainly not the

25     issue for the Court -- but it's the combination of then getting

K7FKCHEC

1    into a vehicle and endangering the rest of us, whatever he

2    wants to do to himself, I understand that.

3            I'm mentioning it because that's where -- I had

4    prepared a letter, because it's out of state, so I would have

5    had to have the Court's permission to allow him to do so at the

6    beginning of March.  They didn't have beds because they were

7    shutting down.  It made no sense to make the request at that

8    point in time.  And what Mr. Cheedie then did, from that point

9    until literally, I think, the day when these events transpired

10   up in Sharon, Massachusetts -- I think your Honor said

11   Connecticut, it's actually Massachusetts --

12           THE COURT:  Sorry.

13           MR. SOSINSKY:  -- is he was in therapy remotely --

14   because that's the only choice that anyone was given, given the

15   unfortunate circumstances that we all found ourselves in -- not

16   only with a therapist that he sought out, but also one that

17   Officer Ahmed had referred him to.  He had started treatment

18   with one, told the therapist that they would need to be

19   providing regular updates to Mr. Ahmed.  Apparently, that

20   program was not associated or affiliated, hadn't done work with

21   pretrial services, they were uneasy about how that would all

22   go, he found another one, and eventually he was twice a week,

23   over the phone, of course, or by videoconference, getting

24   counseling from two different sources, again, one of which was

25   selected or referred to him by Officer Ahmed.

K7FKCHEC

1          During that whole time -- that is, from the end of

2     February/beginning of March -- through when I got an

3     unfortunate phone call on June 26th, I think it was, from his

4     family, he and I had discussed the fact that he needed

5     inpatient alcohol treatment, although it was my

6     understanding -- and I think it's true -- that he actually

7     forbear from consuming alcohol during those months.

8          And, by the way, Judge, once I began occasionally to

9     come back to my office mid-/late April, Mr. Cheedie would come

10    into my suite, I would set him up in a conference room, and he

11    would go over the discovery, and then we would talk from a safe

12    distance with masks on.  He was being, in my view, at least

13    during that time, responsible, also understanding that when

14    things opened up, he needed to be back -- or he needed to be,

15    finally, I should say, in residential alcohol treatment, not

16    because I said it, because that's where he needed to be for his

17    own sake, so that there wouldn't come a day like this one.

18          He needs desperately, Judge, to be in alcohol

19    treatment.  It needs to be inpatient.  I'm not saying this for

20    the purpose of avoiding --

21          THE COURT:  Those programs shut down, is that what

22    you're telling me?

23          MR. SOSINSKY:  Yes.

24          THE COURT:  You're saying he needs inpatient, but you

25    can't get him into it?

K7FKCHEC

1    MR. SOSINSKY:  We can now.  In fact, your Honor should

2    know that when this issue arose -- and it's a serious one, I am

3    not minimizing, I hope your Honor understands, to any extent

4    what your Honor talked about before.  I'm not.

5         THE COURT:  Is inpatient available to him now?

6         MR. SOSINSKY:  Yes, inpatient treatment at Geisinger,

7    which was -- I think it's outside Wilkes Barre, Pennsylvania,

8    the Scranton area, a program that I already provided back in

9    February or beginning of March to pretrial.  As they had a bed

10   for him two weeks ago, we were debating whether to make an

11   application in the interim because your Honor had said --

12        THE COURT:  What's the bottom line, are you seeking

13   his going into this program?

14        MR. SOSINSKY:  I am seeking the Court's direction that

15   he must -- if you're going to allow him to be at liberty on

16   different conditions, of course, that he begins by having to be

17   in residential alcohol treatment with -- full details, they've

18   already been provided to Mr. Ahmed, but, yes, that he be there

19   with updates to be provided and that he be there.  And that, I

20   think -- because alcohol sometimes is treated differently --

21        THE COURT:  How long is the program?

22        MR. SOSINSKY:  Well, they would have an initial

23   program of at least 30 to 60 days, and I think that either

24   there or through a referral, he would be referred to longer

25   term treatment.  If this were a drug addiction, I think your

K7FKCHEC

1  Honor knows that those tend to be -- the inpatient programs
2  tend to be far longer than a month or two, they can run a year,
3  they can run 18 months --
4           THE COURT:  Why are you telling me that?  This isn't
5  drug inpatient.
6           MR. SOSINSKY:  My point is I'm not sure, given what
7  we've seen and given what I know about alcohol addiction, given
8  the struggles that he has had, that longer inpatient treatment
9  should not be required or might not be required.
10          THE COURT:  Mr. Ahmed, have you been able to hear this
11  discussion, sir?  You're on the telephone.
12          MR. AHMED:  Yes, your Honor, I can hear when your
13  Honor speaks clearly.  Unfortunately, when defense counsel
14  speaks, I'm not making out everything that is being said.
15          THE COURT:  All right.  I can shorten it and give you
16  the essence of his lengthy speech -- I mean his remarks -- I'm
17  sorry, I don't mean to sound negative -- but they were fulsome.
18          The reduction of his remarks is:  Mr. Cheedie needs
19  inpatient alcohol treatment, and he has located a facility in
20  Pennsylvania for a minimum of 30-day residential program, and
21  he is recommending that.
22          Do you know this program?  And what are your thoughts
23  about that recommendation?
24          MR. AHMED:  I do not know the program, although I have
25  heard of the program back in March from defense counsel and

K7FKCHEC

1    from Mr. Cheedie.  If the treatment is deemed to be appropriate

2    after an intake, then we do not oppose him entering treatment.

3              THE COURT:  When you say "deemed to be appropriate

4    after an intake," you do the intake or the program does the

5    intake?

6              MR. AHMED:  No, your Honor.  The program would do the

7    intake, and they would make an assessment to deem what the

8    appropriate level of treatment is.

9              THE COURT:  All right.  Just stay on the line, sir.

10             Who pays for this, Mr. Ahmed?  Is this privately paid

11   for?  Or I guess let me ask Mr. Sosinksy.

12             MR. SOSINSKY:  Judge, this would be privately paid for

13   through insurance or his family, unfortunately, having to go

14   into whatever reserves they have.

15             THE COURT:  Mr. Ahmed, what Mr. Sosinksy says is it

16   would be paid either through insurance or by the family.

17             MR. AHMED:  Yes, it's my understanding that we would

18   only pay for our contracted providers, and that provider is not

19   a contracted provider with the courts.

20             MR. SOSINSKY:  Judge, I had a lot more to say, just

21   for your Honor's consideration, separate and apart from the

22   program itself, because I think it's important that --

23             THE COURT:  What do you want to tell me?  Because I

24   think if he goes into a residential program and successfully

25   completes it, that would be very important for his sake and

K7FKCHEC

1   from the standpoint of my protecting the public.

2              MR. SOSINSKY:  No doubt about that.

3              THE COURT:  So, is there anything else you wanted to

4   tell me in light of that?  In other words -- well, I want to

5   hear from the government, but I'd be inclined to not do what I

6   was intending to do -- let's let that be unsaid -- and,

7   instead, direct him to go into this program, and if he

8   successfully completes it, so much the better, and if he

9   doesn't, he will be back before me.

10             MR. SOSINSKY:  Yes, he will, under very different

11  circumstances, certainly.

12             But, Judge, I just wanted you to be aware of the

13  following, because it may offer some degree of both comfort and

14  forecasting, after he completes the program, how things will

15  have changed.  I'm not simply asking that your Honor direct

16  that he get into inpatient treatment because that will come to

17  an end at some point, as Officer Ahmed just indicated, whether

18  30, 60, 90, 120 days, and then the question is what then.  We

19  have proposed -- and I had these discussions with Mr. Ahmed and

20  the government weeks ago -- that his conditions of release be

21  changed as well, such that when he is not -- when he finishes

22  this program, as you say, hopefully successfully, your Honor,

23  for a host of reasons, that he would be monitored

24  electronically and be on, I think, home detention, such that he

25  is not permitted to leave his parents' residence, where he's at

K7FKCHEC

1    right now rather than the apartment that he is giving up where

2    he used to reside in New Jersey, for the remainder of this case

3    except in the event that he successfully gets a new job.  He's

4    certainly lost the job he had before the shutdown, in any

5    event, for medical or for legal reasons.  In other words, that

6    there would be consequences above and beyond the program

7    completion, such that I think -- and your Honor should know,

8    the danger, the concern, would not be present except in the

9    most theoretical sense.

10           Your Honor, I have -- a day after he returned to

11   New York, when his family took him back from Massachusetts to

12   Brooklyn, to their home, I have had the family deliver to me

13   his driver's license, his New Jersey driver's license.  I, as

14   an officer of the Court, have that driver's license.

15           I also have the only key that exists to that vehicle,

16   and the vehicle is not in the same place as Mr. Cheedie.  The

17   vehicle is not in Brooklyn, he will have no access to that.

18           The reason I'm mentioning this, Judge, is I think the

19   danger that your Honor highlighted is the combination of

20   drinking and then getting behind the wheel of a car --

21           THE COURT:  Right.  I tend to believe that what he

22   needs most is treatment.

23           Government, what is your -- and I'd be satisfied with

24   that.  What's your position on this?

25           MS. KEARNEY:  Thank you, your Honor.

K7FKCHEC

1          I think Officer Ahmed knows a lot more about the

2    effectiveness of the various programs, but if we are in

3    agreement that this residential program has a high

4    effectiveness rate, which --

5          THE COURT:  Has a what?

6          MS. KEARNEY:  High effectiveness rate.

7          THE COURT:  High effectiveness rate.  Well, Mr. Ahmed

8    doesn't know.

9          MS. KEARNEY:  Right, which I can't really speak to.

10         Look, your Honor highlighted the concerns that the

11   government has here.  This is someone who --

12         THE COURT:  Speak into the mic.

13         MS. KEARNEY:  I apologize.

14         THE COURT:  Mr. Ahmed, can you hear Ms. Kearney?

15         MR. AHMED:  No, your Honor, I cannot.

16         THE COURT:  Okay.  What she's saying is yes.

17         Now, what else?

18         MS. KEARNEY:  I apologize, your Honor.

19         So the government has the same concerns that your

20   Honor outlined at the beginning; that is, that this is a person

21   who, by my count, it's his third arrest for DUI.  There's one

22   from 2008.  So that's a while ago.

23         THE COURT:  I didn't know that.

24         MS. KEARNEY:  But this is clearly a problem that has

25   plagued Mr. Cheedie for some time.  And, unfortunately, the

K7FKCHEC

1   consequences of that problem are not personal to him.  It is --

2                  THE COURT:  Are you saying what I've said?

3                  MS. KEARNEY:  Yes, your Honor.

4                  THE COURT:  All right.

5                  So, if the government is not disagreeing with what

6   Mr. Sosinksy has suggested, and I think is appropriate, I'm

7   happy with that.  Is there anything else you wanted to add?

8                  MS. KEARNEY:  No, your Honor.

9                  THE COURT:  Okay.  Thank you.

10                 Again, I don't mean to be harsh here to either of you.

11  I just need to move forward, and we have the Curcio hearing.

12                 MS. KEARNEY:  No, no, I didn't mean to suggest that

13  you were cutting me off.  I was thinking about whether it was

14  worth making an additional statement, and I, myself, decided it

15  was not.

16                 THE COURT:  All right.  Fine.

17                 Mr. Cheedie, what do you want to say to me, if

18  anything?  You don't have to say anything at all.  Anything you

19  say can be used against you.  This has nothing to do with the

20  crime with which you're charged; it's an effort to get you on

21  the straight and narrow and to help everybody be protected from

22  you.

23                 THE DEFENDANT:  I desperately need treatment, and I

24  appreciate it.

25                 THE COURT:  All right.  That's what we're going to do.

K7FKCHEC

1          In terms of the application by the pretrial services

2     office for bail revocation, I am not going to revoke bail here

3     for Mr. Cheedie.  I am going to direct him to report, as soon

4     as a bed is available, to --

5          Mr. Sosinksy, give me the name of that outfit again?

6          MR. SOSINSKY:  It is the Geisinger Marworth, M-a-r --

7          THE COURT:  Spell Geisinger loudly, slowly, and

8     clearly and the other word.

9          MR. SOSINSKY:  Geisinger is spelled G-e-i-s-i-n-g-e-r,

10    Marworth, M-a-r-w-o-r-t-h, Treatment Center located in Waverly,

11    Pennsylvania, your Honor.

12         THE COURT:  All right.

13         I'm directing Mr. Cheedie to report to that treatment

14    center in Pennsylvania as soon as a bed is available.  And if a

15    bed is not available within the next ten days, his counsel is

16    to notify me in writing.

17         He shall complete an alcohol abuse program there, for

18    a period of at least 30 days, and it may be longer, depending

19    upon the treatment plan recommended by that treatment center.

20    He is directed to successfully complete their program for

21    alcohol abuse.

22         Upon his successful completion, or his earlier

23    discharge from the program for failing to complete the program,

24    I direct him to be -- I'm adding to the conditions of his

25    release -- home detention enforced by location monitoring

K7FKCHEC

1    technology, to be determined by pretrial services.  Mr. Cheedie

2    may self-install the home monitoring unit under the direction

3    and instruction of pretrial services.

4            He is directed to reside with his parents at 2021 57th

5    Street, Brooklyn, New York, and not to relocate from that

6    address without prior approval of pretrial services.

7            After his discharge, whether successful or

8    unsuccessful, from the alcohol abuse treatment program, he must

9    report to pretrial services in the Southern District of New

10   York, to be fitted with the location monitoring device.

11           As I say, all other conditions of his release -- that

12   is, all prior conditions -- remain in effect.

13           Mr. Sosinksy, does that make sense to you?

14           MR. SOSINSKY:  It does, your Honor.

15           THE COURT:  Government?

16           MS. KEARNEY:  Yes, your Honor.

17           THE COURT:  All right.  That's what I am adding to his

18   conditions of release.

19           Now let's turn to the Curcio hearing.

20           Mr. Cheedie, what's your full name?

21           THE DEFENDANT:  Anthony Michael Cheedie.

22           THE COURT:  How old are you?

23           THE DEFENDANT:  Thirty-five years old.

24           THE COURT:  How far did you go in school?

25           THE DEFENDANT:  B.A. in business administration from

K7FKCHEC

1    BU, Boston University.

2             THE COURT:  BU, did you say?

3             THE DEFENDANT:  Yeah, Boston University.

4             THE COURT:  In the past 24 hours, have you taken any

5    pills, drugs, medication of any kind?

6             THE DEFENDANT:  No.

7             THE COURT:  Are you feeling all right today?

8             THE DEFENDANT:  Yes, sir.

9             THE COURT:  Have you taken any alcoholic beverages in

10   the last 24 hours?

11            THE DEFENDANT:  No, your Honor.

12            THE COURT:  Have you ever been treated or hospitalized

13   for any mental illness?

14            THE DEFENDANT:  No, your Honor.

15            THE COURT:  Have you ever been treated or hospitalized

16   for alcohol abuse?

17            THE DEFENDANT:  No, your Honor.

18            THE COURT:  Are you now, or have you recently been,

19   under the care of a doctor or psychiatrist?

20            THE DEFENDANT:  No.

21            THE COURT:  Is your mind clear?

22            THE DEFENDANT:  Yes, sir.

23            THE COURT:  Mr. Sosinksy, do you have any doubt about

24   Mr. Cheedie's competence to proceed today with this Curcio

25   hearing?

K7FKCHEC

1          MR. SOSINSKY:  No, your Honor.

2          THE COURT:  Ms. Kearney?

3          MS. KEARNEY:  No, your Honor.

4          THE COURT:  All right.  I make the finding that he is

5    fully competent to proceed.

6          Now, the purpose of this proceeding, Mr. Cheedie, is

7    to review various scenarios with you and to ask you some

8    questions.  The issue has arisen as to whether or not there is

9    a conflict that Mr. Sosinksy has representing you.  I don't

10   know that he has a conflict, it's a potential conflict, and I

11   need to make sure that you understand what that potential

12   conflict is because it's going to be up to you to decide

13   whether or not, in light of that potential conflict, you wish

14   to continue with Mr. Sosinksy as your lawyer or whether you

15   want to find a new lawyer.  And, indeed, as I go through these

16   questions, I'm going to offer you the ability to speak with

17   another lawyer about this potential conflict, if that's what

18   you want, but that will be up to you.  The important thing is

19   that I describe to you what this possible conflict is, and to

20   make sure you understand it, and then to determine whether --

21   for you to determine whether or not you want to go forward with

22   Mr. Sosinksy as your lawyer.

23          Do you understand the purpose of this proceeding?

24          THE DEFENDANT:  Yes, your Honor.

25          THE COURT:  All right.

K7FKCHEC

1          Now, in the United States, an attorney has a

2    responsibility to represent his client or her client to the

3    best of his or her ability.  But the obligation of that

4    attorney is 100 percent to that client.

5          Do you understand that?

6          THE DEFENDANT:  Yes, your Honor.

7          THE COURT:  That attorney has a duty of loyalty to

8    that client, not to anybody else.  Do you understand that?

9          THE DEFENDANT:  Yes, sir.

10         THE COURT:  There's also a duty of confidentiality

11   that the lawyer has, in other words, anything you tell

12   Mr. Sosinksy, as long as it's done in the context of his

13   representation of you and in the context of your seeking legal

14   advice, is confidential, and he can't tell anyone else about

15   what you've been telling him, and he can't use anything you've

16   been telling him in any way except in your defense.

17         Do you understand that?

18         THE DEFENDANT:  Yes, your Honor.

19         THE COURT:  So, Mr. Sosinksy has both a duty of

20   loyalty to you, and only you, and a duty of confidentiality

21   that arises out of his representation of you.  Do you

22   understand that?

23         THE DEFENDANT:  Yes, your Honor.

24         THE COURT:  Now, it is possible that Mr. Sosinksy may

25   have formed an attorney-client relationship with someone who's

K7FKCHEC

1    a potential witness in your case.  Do you understand that?

2               THE DEFENDANT:  Yes.

3               THE COURT:  And did you read the letter of

4    Mr. Sosinksy dated June 9, and has he discussed that issue with

5    you and told you who that potential witness is?

6               THE DEFENDANT:  Yes, your Honor.

7               THE COURT:  All right.

8               THE DEFENDANT:  Thoroughly.

9               THE COURT:  Now, if, in fact, Mr. Sosinksy had an

10   attorney-client relationship with the person I'll call the

11   potential witness in your case, he couldn't use anything that

12   would be harmful to that potential witness, because, in this

13   scenario, he was -- the potential witness was a client of

14   Mr. Sosinksy.

15              Do you understand that?

16              THE DEFENDANT:  Yes.

17              THE COURT:  Either way, Mr. Sosinksy has taken the

18   position that he never had an attorney-client relationship with

19   that other witness, that potential witness.  Do you understand

20   that?

21              THE DEFENDANT:  Yes.

22              THE COURT:  So, what the government is talking about

23   is a scenario if, indeed, he did form an attorney-client

24   relationship with that witness.  Do you understand that?

25              THE DEFENDANT:  Yes, your Honor.

K7FKCHEC

1        THE COURT:  So, if he knows something from that

2   potential witness that would be helpful to you, and if that

3   potential witness was his client, then he couldn't use that in

4   any way to help you, because he's bound to the loyalty duty and

5   confidentiality duty to that other witness.

6        Do you understand?

7        THE DEFENDANT:  I understand, your Honor.

8        THE COURT:  And that's the essence of the conflict; he

9   couldn't help you, to the extent that he would be obligated to,

10  if he had a conflicting duty of loyalty and confidentiality to

11  the potential witness, not you.

12       Understood?

13       THE DEFENDANT:  Yes, your Honor.

14       THE COURT:  Okay.

15       Even if Mr. Sosinksy had ended his attorney-client

16  relationship with that witness -- and, remember, he believes he

17  never formed such a relationship -- he still couldn't use

18  anything that potential witness said to help you.

19       Do you understand that?

20       THE DEFENDANT:  Yes, your Honor.

21       THE COURT:  Okay.

22       Now, I can't tell you every potential way that that

23  potential conflict could arise, just because I don't know

24  what's going to happen in this case, but it may be that this

25  potential witness has told Mr. Sosinksy something he could use

K7FKCHEC

1    in questioning some other witness, if he learned it from that

2    potential witness, he couldn't use it, and, therefore, it

3    wouldn't help you.

4             Understood?

5             THE DEFENDANT:  Yes, your Honor.

6             THE COURT:  I'm trying to think of things where this

7    might arise.  Mr. Sosinksy may want to cross-examine somebody

8    in your defense, but he couldn't use something that other

9    potential witness told him in that cross-examination, even if

10   it would help you and would present a real problem here.

11            Do you understand that?

12            THE DEFENDANT:  Yes.

13            THE COURT:  It may even -- and, again, I'm making

14   things up.  It may even be that there might be a witness that

15   Mr. Sosinksy would want to call, but he knows that that, in

16   some way, would hurt you due to information he learned from the

17   potential witness we're talking about.  So he couldn't call

18   that other witness.

19            Make sense?

20            THE DEFENDANT:  Yes.

21            THE COURT:  All right.

22            So I can't foresee all the ways in which that

23   potential conflict may arise that's a part of the issue here.

24            Part of what I have to do, Mr. Cheedie, is to make

25   sure you understand what this potential conflict is.  So, would

K7FKCHEC

1    you tell me, in your own words, what you think I'm blathering

2    on about; that is, what the potential conflict is?  I want to

3    make sure you understand.

4            THE DEFENDANT:  Okay, your Honor.  Beyond obviously

5    speaking to Mr. Sosinksy, I've also been conversing with

6    Mr. Sarikas.

7            THE COURT:  Who is also a lawyer?

8            THE DEFENDANT:  That's the reason I brought him on as

9    counsel, to eliminate that conflict of interest, if there is

10   any.  Also, the slight chance that we do go to trial, and if he

11   needs to be interviewed or cross-examined, the point of having

12   Mr. Sarikas is to solely deal with that potential witness.

13           THE COURT:  Oh, I didn't realize that.  That certainly

14   helps.  That does, indeed.

15           THE DEFENDANT:  I've also conversed with Attorney

16   Donald Yannella, who is counsel for me with my situation in New

17   Jersey, and I covered it with him on the basis, as well, of how

18   I would be using a separate attorney to separate, again, the

19   conflict of interest.

20           THE COURT:  Mr. Sosinksy, is your co-counsel in your

21   firm or anything like that?

22           MR. SOSINSKY:  No, he's independent of my firm.  We've

23   known each other as colleagues for quite some time.  That's

24   all.

25           THE COURT:  All right, fine.

K7FKCHEC

1          Go ahead, Mr. Cheedie, so what's the potential

2      conflict?  And I'm glad you have spoken with other counsel.  Go

3      ahead.

4          THE DEFENDANT:  Well, I understand the potential

5      conflict is if we were to potentially go to trial, and the

6      witness -- the potential witness was to need to be

7      cross-examined by my counsel, we would actually eliminate

8      Mr. Sosinksy from dealing with that altogether.

9          THE COURT:  Why?

10          THE DEFENDANT:  Because of the information that --

11      when they had that meeting back in early or mid-2019, any

12      information that was provided to Mr. Sosinksy during that

13      meeting cannot be used in the court of law.

14          THE COURT:  All right.

15          Now, you want me to appoint another attorney to

16      discuss this conflict with you?  It sounds like you've spoken

17      to people already.

18          THE DEFENDANT:  It's not necessary, your Honor.

19          THE COURT:  All right.  Because I'm prepared to do

20      that if you want.

21          THE DEFENDANT:  No, thank you, your Honor.

22          THE COURT:  All right.

23          Now, do you also understand that if you do decide that

24      you want Mr. Sosinksy to continue to represent you, you can't,

25      in the future, argue that Mr. Sosinksy did not represent you

K7FKCHEC

1    adequately because he had this conflict?

2              Do you understand that?

3              THE DEFENDANT:  I understand that's the reason we're

4    here, I understand.

5              THE COURT:  All right.

6              So, what is your pleasure, sir?  Do you want

7    Mr. Sosinksy to continue to represent you in connection with

8    the charges against you in this indictment?

9              THE DEFENDANT:  I would love for him to continue to

10   represent me, your Honor.

11             THE COURT:  All right.  I do make the finding that

12   Mr. Cheedie has knowingly and voluntarily chosen Mr. Sosinksy

13   to serve as his attorney here and that he has waived his right

14   to conflict-free representation.

15             All right.  Mr. Cheedie, thank you.  You've satisfied

16   me that you're intelligent, you understand this, you're

17   articulate.  I don't know why you're getting into trouble with

18   alcohol, but maybe somebody can -- maybe you'll understand that

19   after this treatment.  It makes absolutely no sense for alcohol

20   to be erecting barriers in your life professionally.  I assume

21   there have been problems personally.  It just makes no sense.

22   So, try to get a hold of it.  Actually, do more than try to get

23   a hold of that problem, take hold of that problem and conquer

24   it, and you will be a lot better off.

25             Do you understand that?

K7FKCHEC

1        THE DEFENDANT:  Yes, sir.  I will, your Honor.

2        THE COURT:  In some way, getting your alcohol problems

3    or your ability to -- your willingness to go to alcohol

4    treatment has saved you from my revoking your bail and sending

5    you to jail, but, on the other hand, if you didn't have the

6    alcohol problem, you probably wouldn't be here, in the first

7    place, so get rid of that problem.

8        You understand?

9        THE DEFENDANT:  Yes, I will, your Honor.

10        THE COURT:  For your sake, and the sake of your case

11    here, and the sake of your future happiness.

12        Anything else that I can do for the government?

13        MS. KEARNEY:  No, your Honor.  Thank you very much.

14        THE COURT:  Anything else I can do for the defense?

15        MR. SOSINSKY:  No, your Honor.  Thank you very much

16    for having us.

17        THE COURT:  And we have another date in this case, as

18    I remember.  We had a telephone conference last week.

19        MS. KEARNEY:  We do, and I don't know it off the top

20    of my head.

21        THE COURT:  I couldn't hear you.

22        MS. KEARNEY:  I said we do, and I don't know it off

23    the top of my head.

24        THE COURT:  Thank you, all, I appreciate it.  And I

25    appreciate all the people in the back coming in support of

K7FKCHEC

1   Mr. Cheedie, especially in this very difficult time for

2   everyone.  Stay safe, everyone.

3           MR. SOSINSKY:  Thank you, your Honor.

4           MR. AHMED:  Thank you, your Honor.

5           THE COURT:  Oh, Mr. Ahmed, thank you for appearing by

6   phone.

7           MR. AHMED:  I would like to thank you for allowing me

8   to appear telephonically, and I apologize for any inconvenience

9   that may have caused any of the parties.

10          THE COURT:  No inconvenience at all.  Stay safe, sir.

11          MR. AHMED:  Thank you, sir.

12                                  * * *

13

14

15

16

17

18

19

20

21

22

23

24

25